**No. 21-1274**

# In the United States Court of Appeals for the Fourth Circuit

---

DIANA MEY, ET AL.,

individually and on behalf of a class of all persons and entities similarly situated,
*Plaintiffs-Appellees,*

v.

DIRECTV, LLC,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of West Virginia
Case No. 5:17-cv-00179-JPB-JPM (The Honorable John P. Bailey)

---

## PLAINTIFFS-APPELLEES' RESPONSE BRIEF

---

JOHN W. BARRETT
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555

MATTHEW W.H. WESSLER
LINNET DAVIS-STERMITZ
GUPTA WESSLER PLLC
2000 L Street, NW, Suite 850
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

MATTHEW P. MCCUE
THE LAW OFFICE OF MATTHEW P.
MCCUE
1 South Avenue, Suite 3
Natick, MA 01760
(508) 655-1415

NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

*Counsel for Plaintiffs-Appellees*

July 29, 2021                           *(additional counsel listed on inside cover)*

EDWARD A. BRODERICK
BRODERICK LAW, P.C.
176 Federal Street, Fifth Floor
Boston, MA 02111
(617) 738-7080

ANTHONY PARONICH
PARONICH LAW, P.C.
350 Lincoln St., Suite 2400
Hingham, MA 02043
(617) 485-0018

# TABLE OF CONTENTS

Table of authorities ................................................................. iii

Introduction ........................................................................... 1

Statement of the issues ........................................................... 3

Statement of the case ............................................................. 4

     1.    The rise of "infinite" arbitration provisions. ................... 4

     2.    Courts uniformly refuse to enforce AT&T Mobility's infinite arbitration clause. .................................... 6

     3.    DIRECTV moves to compel arbitration of Ms. Mey's claims based on the AT&T Mobility contract she signed years before this controversy arose. ......................... 7

     4.    This Court holds that a contract was formed and that this dispute falls within its scope, then remands the question of unconscionability. ................................. 9

     5.    After rejecting DIRECTV's waiver argument, the district court holds that AT&T Mobility's arbitration contract is unenforceable. ................................................. 11

Summary of argument .......................................................... 12

Argument ............................................................................ 15

     I.    The district court correctly concluded that it would be unconscionable under West Virginia law to require Ms. Mey to arbitrate her claims against DIRECTV. ....................... 16

          A.    The arbitration contract's unprecedented breadth renders it substantively unconscionable. .................. 17

          B.    The arbitration contract is procedurally unconscionable because it was imposed on unsophisticated consumers as part of a take-it-or-leave-it contract inconveniently displayed on a pinpad device at the point of sale. ................... 26

i

II.   DIRECTV's attempts to evade a decision on the merits of Ms. Mey's unconscionability challenge should be dismissed. ................... 31

A.   The district court did not abuse its discretion in rejecting DIRECTV's waiver argument. ................................. 32

B.   Because *Mey I* involved only formation and scope, it does not control the resolution of unconscionability here. ................................................................................ 39

III.  The Federal Arbitration Act does not preempt the district court's application of West Virginia's unconscionability doctrine. ........................................................................... 45

A.   The Federal Arbitration Act does not apply here because Ms. Mey's TCPA claims against DIRECTV do not "arise out" of her contract with AT&T Mobility. ............ 46

B.   Nothing about the district court's state-law unconscionability analysis targets or disfavors arbitration. .............................................................. 49

Conclusion ........................................................................... 52

# TABLE OF AUTHORITIES

## Cases

*Anand v. Health,*
  2019 WL 2716213 (N.D. Ill. June 28, 2019) ......................................... 34

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011) ................................................................ 25

*Brown ex rel. Brown v. Genesis Healthcare Corp.,*
  724 S.E.2d 250 (W. Va. 2011) .................................................. *passim*

*Brown v. Genesis Healthcare Corp.,*
  729 S.E.2d 217 (W. Va. 2012) .................................................. *passim*

*Bruni v. Didion,*
  160 Cal. App. 4th 1272 (2008) .................................................... 19

*Buckeye Check Cashing, Inc. v. Cardegna,*
  546 U.S. 440 (2006) .................................................................. 4

*Calderon v. Sixt Rent a Car, LLC,*
  — F.4th —, 2021 WL 2946428 (11th Cir. July 14, 2021) ................... 14, 46, 47, 48

*Collins v. Click Camera & Video, Inc.,*
  621 N.E.2d 1294 (Ohio Ct. App. 1993) ............................................ 24

*Credit Acceptance Corp. v. Front,*
  745 S.E.2d 556 (W. Va. 2013) ..................................................... 16

*Crocker v. Piedmont Aviation, Inc.,*
  49 F.3d 735 (D.C. Cir. 1995) ...................................................... 37

*Dan Ryan Builders, Inc. v. Nelson,*
  737 S.E.2d 550 (W. Va. 2012) ..................................................... 17

*Degidio v. Crazy Horse Saloon & Restaurant Inc.,*
  880 F.3d 135 (4th Cir. 2018) ...................................................... 46

*Dickinson v. Auto Center Manufacturing Co.,*
  733 F.2d 1092 (5th Cir. 1983) ..................................................... 40

iii

*Dillon v. BMO Harris Bank, N.A.,*
    856 F.3d 330 (4th Cir. 2017) ........................................................ 49, 50

*Doctor's Associates, Inc. v. Casarotto,*
    517 U.S. 681 (1996) .................................................................. 15, 49

*Federal Insurance Co. v. American Home Assurance Co.,*
    639 F.3d 557 (2d Cir. 2011) ............................................................ 47

*Fiberlink Communications Corp. v. Magarity,*
    72 F. App'x 22 (4th Cir. 2003) ........................................................ 36

*Goodwin v. Branch Banking & Trust Co.,*
    2017 WL 960028 (S.D.W. Va. Mar. 10, 2017) .................................... 17

*Goodwin v. Branch Banking & Trust Co.,*
    699 F. App'x 274 (4th Cir. 2017) ..................................................... 31

*Gutierrez v. Autowest, Inc.,*
    114 Cal. App. 4th 77 (2003) ............................................................ 20

*In re Checking Account Overdraft Litigation MDL No. 2036,*
    685 F.3d 1269 (11th Cir. 2012) ........................................................ 49

*In re Checking Account Overdraft Litigation,*
    754 F.3d 1290 (11th Cir. 2014) ........................................................ 38

*In re Jiffy Lube International, Inc., Text Spam Litigation,*
    847 F. Supp. 2d 1253 (S.D. Cal. 2012) .................................... 5, 16, 19

*In re Woods,*
    743 F.3d 689 (10th Cir. 2014) ......................................................... 47

*Kessler v. National Enterprises, Inc.,*
    203 F.3d 1058 (8th Cir. 2000) ......................................................... 37

*Kindred Nursing Centers Ltd. Patnership v. Clark,*
    137 S. Ct. 1421 (2017) ................................................................... 52

*Labor Relations Division of Construction Industries of Massachusetts, Inc. v.*
    *Teamsters Local 379,*
    156 F.3d 13 (1st Cir. 1998) ............................................................. 36

*Lorenzo v. Prime Communications, L.P.*,
   806 F.3d 777 (4th Cir. 2015) ............................................................ 15

*Lovelace v. Lee*,
   472 F.3d 174 (4th Cir. 2006) ............................................................ 35

*Marmet Health Care Center, Inc. v. Brown*,
   565 U.S. 530 (2012) ............................................................................ 17

*McFarland v. Wells Fargo Bank, N.A.*,
   810 F.3d 273 (4th Cir. 2016) ............................................................ 16

*McFarlane v. Altice USA, Inc.*,
   2021 WL 860584 (S.D.N.Y. Mar. 8, 2021) .............................. *passim*

*Mey v. DIRECTV, LLC*,
   971 F.3d 284 (4th Cir. 2020) ...................................................... *passim*

*Meyers v. Baltimore County*,
   981 F. Supp. 2d 422 (D. Md. 2013) ............................................ 36, 38

*Muriithi v. Shuttle Express, Inc.*,
   712 F.3d 173 (4th Cir. 2013) ........................................................ 34, 49

*Nationstar Mortgage, LLC v. West*,
   785 S.E.2d 634 (W. Va. 2016) ...................................................... 27, 30

*New Prime Inc. v. Oliveira*,
   139 S. Ct. 532 (2019) ........................................................................ 46

*Noohi v. Toll Brothers*,
   708 F.3d 599 (4th Cir. 2013) ............................................................ 52

*Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*,
   974 F.2d 502 (4th Cir. 1992) ............................................................ 36

*Parm v. Bluestem Brands, Inc.*,
   898 F.3d 869 (8th Cir. 2018) ............................................................ 43

*Pasco ex rel. Pasco v. Knoblauch*,
   566 F.3d 572 (5th Cir. 2009) ...................................................... 36, 38

*Peterson v. Air Line Pilots Association, International,*
  759 F.2d 1161 (4th Cir. 1985) .............................................................. 33

*Reading Aviation Service, Inc. v. Bertolet,*
  311 A.2d 628 (Pa. 1973) ...................................................................... 19

*Reading Health System v. Bear Stearns & Co.,*
  900 F.3d 87 (3d Cir. 2018) ................................................................... 47

*Revitch v. DIRECTV, LLC,*
  977 F.3d 713 (9th Cir. 2020) ....................................................... *passim*

*Riley v. MEBA Pension Trust,*
  452 F. Supp. 117 (S.D.N.Y. 1978) ....................................................... 36

*Rogers v. McDorman,*
  521 F.3d 381 (5th Cir. 2008) ............................................................... 32

*Scherk v. Alberto-Culver Co.,*
  417 U.S. 506 (1974) ............................................................................. 4

*Sejman v. Warner-Lambert Co.,*
  845 F.2d 66 (4th Cir. 1988) ................................................................. 40

*Shorts v. AT&T Mobility,*
  2013 WL 2995944 (W. Va. June 17, 2013) ........................................... 25

*Smith v. Steinkamp,*
  318 F.3d 775 (7th Cir. 2003) .......................................................... 19, 22

*Smith v. Sushka,*
  117 F.3d 965 (6th Cir. 1997) .......................................................... 32, 34

*St. Luke's Cataract & Laser Institute, P.A. v. Zurich American Insurance Co.,*
  506 F. App'x 970 (11th Cir. 2013) ....................................................... 47

*State ex rel. Ocwen Loan Servicing, LLC v. Webster,*
  752 S.E.2d 372 (W. Va. 2013) ............................................................. 28

*State ex rel. Richmond American Homes of West Virginia, Inc. v. Sanders,*
  717 S.E.2d 909 (W. Va. 2011) ..................................................... 22, 28, 29

*Stolt-Nielson, S.A. v. AnimalFeeds International Corp.*,
    559 U.S. 662 (2010) ................................................................. 20

*Thomas v. Cricket Wireless, LLC*,
    506 F. Supp. 3d 891 (N.D. Cal. 2020) ................................. 7, 16

*Thompson v. Toll Dublin, LLC*,
    165 Cal. App. 4th 1360 (2008) ............................................. 19

*United States v. Morris*,
    259 F.3d 894 (7th Cir. 2001) ............................................... 36

*United States v. Sanchez-Lopez*,
    879 F.2d 541 (9th Cir. 1989) ........................................... 36, 38

*Valued Services of Kentucky, LLC v. Watkins*,
    309 S.W.3d 256 (Ky. Ct. App. 2009) .................................. 19

*Wachovia Bank, National Association v. Schmidt*,
    445 F.3d 762 (4th Cir. 2006) ............................................... 47

*Wexler v. AT & T Corp.*,
    211 F. Supp. 3d 500 (E.D.N.Y. 2016) ............................... 7, 19

*Yesudian ex rel. United States v. Howard University*,
    270 F.3d 969 (D.C. Cir. 2001) ............................................ 37

## Statute

9 U.S.C. § 2 ....................................................................... *passim*

## Other Authorities

18B Wright & Miller,
    Federal Practice & Procedure (2021) .................................. 37

Case Note, 134 Harv. L. Rev. 2871 (2021).................................. 18

David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633 (2020) .............. 5, 48

## INTRODUCTION

Diana Mey received a number of illegal telemarketing calls in 2017 and 2018 that tried to convince her to subscribe to DIRECTV's satellite-television plans. When Ms. Mey filed this action to remedy the company's violations of the Telephone Consumer Protection Act, DIRECTV moved to compel arbitration. But the company had a problem: Ms. Mey had never entered into an arbitration contract— or any contract at all—with DIRECTV.

So DIRECTV devised a workaround. It turns out that, back in 2012, Ms. Mey had obtained a new cell phone line with AT&T Mobility. And, by pressing the "accept" button on an electronic pinpad device at the store, Ms. Mey had entered into a contract that required her to arbitrate "all disputes and claims" she had not just with AT&T Mobility but also with any of its "affiliates"—past, current, or future. As luck would have it, in 2015—two years before DIRECTV illegally robocalled her—AT&T Mobility's ultimate parent company, AT&T Inc., acquired DIRECTV. Based on this chain of happenstance, DIRECTV argued that Ms. Mey's contract with AT&T Mobility could be extended to any claims that she had—or ever would have—against DIRECTV too.

Joining every other court to have considered this contract's extreme breadth, the district court here refused to enforce it. West Virginia law has long held that a "one-sided" contract term that has "an overly harsh effect on the disadvantaged

party" is unconscionable. *Brown v. Genesis Healthcare Corp.*, 729 S.E.2d 217, 228 (W. Va. 2012) ("*Brown II*"). And this is particularly true when a standard form contract imposes "terms that are oppressive . . . or beyond the reasonable expectations of an ordinary person." *Id.* Applying these general state-law principles, the district court concluded that the contract here was unconscionable.

That conclusion is correct. No ordinary person in Ms. Mey's position would reasonably expect that, by obtaining an AT&T Mobility cell phone line, she would be compelled to arbitrate TCPA claims against an entirely different company trying to sell satellite-TV subscriptions—let alone *any* claim she *ever* might have against any company that someday happened to fall somewhere under AT&T's vast corporate umbrella. And there is little doubt that the provision operates to constrain Ms. Mey far more than it constrains AT&T Mobility—making it unreasonably one-sided.

DIRECTV barely attempts to defend the contract's breadth or one-sidedness. In fact, it spends less than a fifth of its brief on unconscionability—the actual issue in this appeal. Instead, DIRECTV largely pushes this Court to overlook the contract's unconscionability and reverse anyway. The company claims that this Court's prior decision on formation and scope somehow already resolved the unconscionability issue, that it was waived altogether, and that the Federal Arbitration Act preempts the district court's straightforward application of West Virginia contract law.

None of these attempts to dodge the issue presented in this appeal should prevail. This Court in its previous decision specifically remanded both the question of waiver and the question of unconscionability to the district court for it to consider in the first instance. And the district court thoroughly considered and resolved both issues while easily rejecting DIRECTV's weak preemption arguments. Because the district court properly concluded that the arbitration provision here is unconscionable, this Court should affirm.

## STATEMENT OF THE ISSUES

1. Did the district court correctly conclude that AT&T Mobility's infinite arbitration contract—which covers any dispute that any AT&T Mobility customer might ever have with any of the company's past, current, or future affiliates—is unconscionable under West Virginia law?

2. Did the district court abuse its discretion in rejecting DIRECTV's argument that waiver precluded the court from reaching the question of the contract's unconscionability?

3. Did the district court correctly conclude that the Federal Arbitration Act does not preempt West Virginia's generally applicable contract defense of unconscionability?

## STATEMENT OF THE CASE

### 1.    The rise of "infinite" arbitration provisions.

Congress enacted the Federal Arbitration Act in 1925 to "overcome judicial resistance to arbitration" and to place arbitration contracts "on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).[1] To that end, section 2 of the FAA provides that a "written provision" in "a contract . . . to settle by arbitration a controversy . . . arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

Contract drafters over the past century have inserted language into their contracts that permits arbitration of a broad range of disputes. Still, they have ordinarily adopted language that complies with the text of section 2—providing, for instance, that the contracting parties agreed to arbitrate "any controversy or claim that shall arise out of this agreement or the breach thereof." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 508 (1974). Courts routinely enforce these sorts of contracts under the FAA. *See id.*

But in the last few decades, drafters have begun pushing beyond the plain text of the FAA by "experiment[ing]" with arbitration provisions that could "aptly" be

---

[1] Unless otherwise indicated, all internal quotation marks, citations, and alterations are omitted throughout this brief.

called "infinite." David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 639 (2020); *McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *6 (S.D.N.Y. Mar. 8, 2021). For instance, some companies now require their customers to sign contracts that say they will arbitrate not just claims against the companies themselves, but also claims with any other entities that once were, or might someday later become, affiliated with those companies. *See* Horton, 168 U. Pa. L. Rev. at 657-59 & n.178. Others insist on forcing their customers to arbitrate claims arising at any point in time—whether long before or long after signing the contract. *See id.* at 657-59 & nn.176, 187.

Recently, despite the plain text of the FAA, companies have dispensed with requiring any link at all between the parties' contract and the sorts of claims that it sends to arbitration. The cell phone company Sprint, for example, requires its over 70 million customers to arbitrate "ANY (we really mean ANY) disagreements" with the company. *Id.* at 639; *see also, e.g.*, *id.* at 657-58 (discussing examples from bank accounts, employment contracts, car rental agreements, and even church membership applications); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1262-63 (S.D. Cal. 2012). And others have gone further still, stacking one infinite provision on top of another in take-it-or-leave-it contracts that give consumers no indication of their astonishing breadth until they appear, years later, as a basis to compel arbitration of some unrelated claim against what was until recently an entirely different corporate entity.

### 2.    Courts uniformly refuse to enforce AT&T Mobility's infinite arbitration clause.

That precisely describes AT&T Mobility's arbitration contract here. In fact, this Court has already called this contract "much more expansive" and "far broader than the arbitration clauses in" any case it has considered. *Mey v. DIRECTV, LLC*, 971 F.3d 284, 293 (4th Cir. 2020) ("*Mey I*"). The contract purports to bind customers to arbitrate any claim they might have against any entity that is affiliated with AT&T Mobility. Its key language, which appears in the "wireless customer agreement" that a customer must acknowledge when purchasing a cell phone or activating a service plan, is reproduced below:

> AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:
>
> - claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory;
> - claims that arose before this or any prior Agreement (including but not limited to, claims related to advertising);
> - claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
> - claims that may arise after the termination of this Agreement.
>
> References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us.

JA50.

AT&T Mobility and, in turn, any of its affiliated entities—including DIRECTV—have repeatedly used this provision to try to compel arbitration of claims that are entirely unrelated to the wireless customer agreement or a purchase of a cell phone or plan. But courts have unanimously refused to enforce the contract in these circumstances. Some have held that no contract was actually formed, or that the parties' dispute did not fall within the provision's scope. *See, e.g.*, *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717-21 (9th Cir. 2020); *Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500, 503-05 (E.D.N.Y. 2016). Others, like the district court here, have held that the provision's extreme breadth renders it unconscionable under state law. *See, e.g.*, JA230-39; *Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891 (N.D. Cal. 2020).

### 3.     DIRECTV moves to compel arbitration of Ms. Mey's claims based on the AT&T Mobility contract she signed years before this controversy arose.

Ms. Mey filed this action in 2017, alleging that she had received illegal telemarketing calls from DIRECTV despite the fact that her number was listed on the National Do Not Call Registry. JA183-223.

DIRECTV didn't want to litigate this case in court; it preferred to resolve the dispute in arbitration. But Ms. Mey wasn't a DIRECTV customer—that's why it was robocalling her in the first place. So, as in other cases, the company piggybacked on the AT&T Mobility contract. It pointed to a transaction that Ms. Mey had made at an AT&T Mobility store years earlier in 2012, when she added a new line of service

7

as an authorized user on her husband's wireless service account. JA19. As part of that transaction, she was presented with a pinpad device that displayed a few lines at a time of AT&T Mobility's wireless customer contract. JA148. That page gave her the options to "PRINT," click through pages and pages of the company's terms, or jump right to an acceptance screen. *Id.* And once on that acceptance screen, she was required to sign an acknowledgment that she had "reviewed and agree[d] to the rates, terms, and conditions for the wireless products and service described in the Wireless Customer Agreement (including limitation of liability and arbitration provisions) . . . which were made available to me prior to my signing" and to click a corresponding "I accept" button. JA150; *see also* JA34.

The acknowledgement screen itself gave her no option to return to find those provisions. *See id.* But if she had paged through all the terms carefully beforehand, she might have seen the referenced "arbitration provision" —by which she "agree[d] to arbitrate all disputes and claims" with AT&T Mobility and any of its "affiliates." JA50; *see* p. 6, *supra*.

Based on these events, DIRECTV moved to compel arbitration. The company argued that, since it had been acquired by the AT&T parent company in 2015, it was an "affiliate" of AT&T Mobility—so Ms. Mey's signature on the AT&T Mobility acknowledgment page meant she'd agreed to arbitrate disputes with it, too. The district court denied the motion, holding that Ms. Mey's claims "did not fall

within the ambit of the arbitration agreement." JA178. It first suggested that no contract was formed because DIRECTV wasn't an "affiliate" at the time Ms. Mey signed the contract. *See* JA178-79. The court also concluded that Ms. Mey's TCPA claim fell outside the provision's scope, which it interpreted as limited to disputes arising under the contract or relating to the provision of cellular service. JA180-81. The court then registered its concern that, in the event that the claim *was* covered under a validly formed contract, the contract was likely "unconscionably overbroad." JA181.

### 4. This Court holds that a contract was formed and that this dispute falls within its scope, then remands the question of unconscionability.

DIRECTV appealed that decision and a divided panel of this Court reversed. *See Mey I*, 971 F.3d at 284. It first explained that, under the strikingly broad text of the AT&T Mobility contract, Ms. Mey *had* formed an agreement to arbitrate with DIRECTV—even though DIRECTV wasn't an affiliate at the time Ms. Mey had signed the contract. *Id.* at 288-92 (holding that the "ordinary meaning" of the term "affiliate" encompasses entities like DIRECTV and that nothing in the text of the contract limited "affiliates" to those affiliated with AT&T Mobility when the contract was executed).

Next, the majority concluded that Ms. Mey's claims also fell within the contract's scope because it was "susceptible of an interpretation that covers the

9

asserted dispute." *Id.* The majority acknowledged the contract was "much more expansive than the arbitration provisions" found in previous cases—indeed, broader than those in "any case the parties ha[d] identified." *Id.* at 293. But, "[i]nterpret[ing] and enforc[ing]" the "particular" words in the contract, it held that "[n]othing" limited them to "disputes or claims arising out of or relating to the underlying contract or the provision of wireless service." *Id.* Instead, the contract's "expansive text . . . arguably contemplates arbitration of Mey's [TCPA] claims." *Id.* That was enough, in the majority's view, because of the federal presumption to resolve any ambiguities "in favor of arbitration." *Id.* at 294.

To be sure, the majority acknowledged, the provision's exceptionally broad language "could lead to troubling hypothetical scenarios." *Id.* But because it did not need to "define the outer limits" of the contract to conclude that the TCPA claims "fall within its scope," the Court considered only the question of what claims were "specifically included" in that scope. *Id.* at 294-95.

After reaching this conclusion, the panel recognized that the district court had suggested that such an interpretation might render the contract "unconscionably overbroad." *Id.* at 295. But because the district court had not fully considered the issue of unconscionability under West Virginia law, it remanded the question to the district court alongside, at DIRECTV's request, the question whether any consideration of unconscionability had been waived. *Id.* at 295.

10

5.    **After rejecting DIRECTV's waiver argument, the district court holds that AT&T Mobility's arbitration contract is unenforceable.**

On remand, the district court followed this Court's instructions, entertaining short briefs from the parties on both unconscionability and waiver. *See* JA16-17. Considering those issues, the district court first rejected DIRECTV's argument that any unconscionability challenge was waived. Applying the longstanding rule that courts have discretion to entertain new arguments so long as they are relevant and do not prejudice the other party, the court found no basis for refusing to consider the question of the contract's unconscionability. JA225-26. The issue had been raised earlier, so everyone was on notice of its relevance, and nothing about the issue was unanticipated—the Fourth Circuit had specifically remanded it to the district court and the parties were able to fully brief it. JA226.

The district court then concluded that the contract was unconscionable under West Virginia law. It was procedurally unconscionable because it was a contract of adhesion imposed by a massive corporation on a consumer—one who wasn't even an accountholder—under circumstances that would have made it difficult for any customer to find the arbitration provision in the first place, let alone "reasonably expect[]" its breadth. JA233-34. And it was substantively unconscionable too. For one thing, its requirement that consumers arbitrate issues with no relationship to the contract was "beyond the reasonable expectations of an ordinary person." JA235. In

addition, the court held that the contract lacked "mutuality" because it was much harder—if not impossible—for consumers to know whether, and when, they could invoke the arbitration provision than it was for AT&T Mobility to do so. JA239.

## SUMMARY OF ARGUMENT

**I.** Section 2 of the FAA allows courts to refuse to enforce an arbitration contract based on generally applicable state-law defenses like unconscionability. The district court properly applied West Virginia law to do that here.

**A.** A contract is substantively unconscionable where it has "an overly harsh effect on the disadvantaged party" and is unreasonably "one sided." *See Brown II,* 729 S.E.2d at 228-29. Both are true here. AT&T Mobility's arbitration contract has overly harsh effects because it imposes obligations far beyond an ordinary person's "reasonable expectations." *See id.* at 228. No ordinary person could expect that signing a contract with AT&T Mobility in 2012 for wireless service would, five years later, require arbitration of TCPA claims against an entirely different company. And the provision's unreasonable breadth is compounded by its substantial one-sidedness. Because of its vast corporate umbrella and distinct informational advantages, any company ever affiliated with AT&T can control its conduct and selectively enforce the arbitration contract when it is favorable for the company while a consumer lacks any meaningful way to do the same. The contract's few supposedly pro-consumer features can't counteract this extreme breadth and one-sidedness.

**B.** AT&T Mobility's contract is also procedurally unconscionable. As a contract of adhesion, it warrants heightened scrutiny—which it cannot withstand. Not only was there a massive gap of sophistication between these bargaining parties, but the contract was presented to Ms. Mey as part of a take-it-or-leave-it contract inconveniently displayed in fine print on an electronic pinpad device at the time of her purchase. Such fine print and legalese compel a finding of procedural unconscionability under West Virginia law—particularly when, as here, the consumer had no reasonable opportunity to understand the contract's terms.

**II.** All of DIRECTV's attempts to evade a ruling on the merits fail.

**A.** The district court did not abuse its discretion in concluding that neither surprise nor prejudice prevented it from considering the issue of unconscionability. DIRECTV all but admitted that there was no surprise regarding the issue of unconscionability, given that the district court raised it earlier and this Court explicitly instructed the district court to consider it on remand. And the only claim of prejudice the company could muster was that it would take time to brief the issue. Not only that, but addressing unconscionability only after finally resolving the threshold questions of formation and scope makes sense—as DIRECTV itself argued, assessing the contract's unconscionability logically comes after these questions, so even if the issue had been fully briefed earlier, nothing about this

litigation would be different. It was therefore well within the court's discretion to reject waiver and address unconscionability.

**B.** DIRECTV is also wrong that this Court's previous decision in *Mey I*—which involved only the contract's formation and scope—somehow controls the outcome on unconscionability too. This Court expressly declined to address unconscionability there, and instead instructed the district court to address that issue on remand. Nor does the district court's analysis conflict with *Mey I*'s reasoning. In *Mey I*, this Court evaluated the contract's plain text to determine whether this dispute fell within its scope—it said nothing about the fairness of the contract's terms or whether they exceeded ordinary consumers' reasonable expectations. So the district court properly resolved those issues in the first instance.

**III.A.** The FAA cannot preempt the district court's ruling because it does not apply here at all. Section 2 makes clear that the Act covers only those controversies that "aris[e] out" of the contract containing the arbitration provisions. 9 U.S.C. § 2; *see Calderon v. Sixt Rent a Car, LLC*, — F.4th —, 2021 WL 2946428, at *6-7 (11th Cir. July 14, 2021); *Revitch*, 977 F.3d at 721-24 (O'Scannlain, J., concurring). And this controversy does not: Ms. Mey's TCPA claims against DIRECTV bear no relationship to the arbitration contract she formed with AT&T Mobility.

**B.** Even if the FAA does apply, DIRECTV's preemption argument must be rejected. The Supreme Court has repeatedly held that courts can refuse to enforce

arbitration contracts based on unconscionability so long as doing so does not target arbitration. And nothing about the district court's analysis here turned on the fact that the contract requires arbitration. Instead, the court relied on the contract's unreasonable breadth and one-sidedness—general concerns that would similarly render *non*-arbitration contracts unconscionable.

## ARGUMENT

Although the Supreme Court has "acknowledged a liberal federal policy favoring arbitration, . . . it has also consistently held that § 2 of the FAA reflects the fundamental principle that arbitration is a matter of contract." *Lorenzo v. Prime Commc'ns, L.P.*, 806 F.3d 777, 781 (4th Cir. 2015). Section 2 thus makes clear that an arbitration contract can be held unenforceable based upon "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This means that "generally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening" the FAA. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

That is precisely what the district court did here. West Virginia law holds, as a general matter, that a contract is unconscionable where there has been "an absence of meaningful choice on the part of one of the parties together with contract terms that are unreasonably favorable to the other party." *Brown II*, 729 S.E.2d at 226. The district court concluded that AT&T Mobility's extraordinarily broad arbitration

contract fits the bill. JA230-39. And that conclusion is not surprising: The contract covers *any* dispute (no matter how unrelated to the contract) with *any* AT&T Mobility affiliate (even an entity acquired in the future) at *any* time (forever). Every court to have considered whether this language is unconscionable has likewise held it unenforceable. *See, e.g.*, *Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891, 904-07 (N.D. Cal. 2020); *see also McFarlane*, 2021 WL 860584, at *8 (finding similar provision unconscionable); *Jiffy Lube*, 847 F. Supp. 2d at 1262-63 (same). This Court should affirm.

## I.     The district court correctly concluded that it would be unconscionable under West Virginia law to require Ms. Mey to arbitrate her claims against DIRECTV.

"West Virginia's traditional unconscionability doctrine . . . requires a showing of both substantive unconscionability, or unfairness in the contract itself, and procedural unconscionability, or unfairness in the bargaining process." *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 277 (4th Cir. 2016). Although distinct, the two component parts nevertheless have some "interplay." *Credit Acceptance Corp. v. Front*, 745 S.E.2d 556, 564 (W. Va. 2013). Thus, while both components are required to make a contract unenforceable, they "need not be present to the same degree." *Brown II*, 729 S.E.2d at 227. Instead, there's a "sliding scale"—"the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required" (and vice versa). *Id.*

## A.     The arbitration contract's unprecedented breadth renders it substantively unconscionable.

We turn first to substantive unconscionability. Although "[n]o single, precise definition of substantive unconscionability can be articulated" because "the factors to be considered vary with the content of the agreement at issue," West Virginia's high court has identified several that are useful. *Id.* at 229. These include the "commercial reasonableness of the contract terms," their "purpose and effect," the "allocation of the risks between the parties," and "public policy concerns." *Id.* at 228. More fundamentally, though, whether a contract is substantively unconscionable boils down to two questions. *First*, does the contract "have an overly harsh effect on the disadvantaged party"—or, put differently, does it impose "terms that are oppressive, unconscionable or beyond the reasonable expectations of an ordinary person"? *Brown II*, 729 S.E.2d at 228.[2] And *second*, is the contract term "one-sided and unreasonably favorable to one party"? *Dan Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550, 552 (W. Va. 2012).

---

[2] Although the question whether a contract imposes "oppressive" terms "beyond the reasonable expectations of an ordinary person" often comes up in the procedural unconscionability context, that question *also* bears on the fairness of "the substantive contract terms themselves"—*i.e.*, substantive unconscionability. *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 724 S.E.2d 250, 288 (W. Va. 2011) ("*Brown I*"), *rev'd on other grounds by Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012); *see also Goodwin v. Branch Banking & Tr. Co.*, 2017 WL 960028, at *5 (S.D.W. Va. Mar. 10, 2017), *aff'd*, 699 F. App'x 274 (4th Cir. 2017) (holding contract substantively unconscionable because "the terms are well beyond the reasonable expectations of an ordinary person").

As we explain below, the arbitration contract here implicates both of these concerns—to an extreme degree. The district court therefore properly concluded that it is substantively unconscionable. JA235-39.

**1. Unreasonable breadth.** The contract's breathtaking breadth has an unreasonably harsh effect on AT&T Mobility consumers like Ms. Mey. It renders a wide swath of their interactions unexpectedly subject to arbitration—while giving consumers no means to comprehend or structure their conduct around that obligation. And "it purport[s] to extend indefinitely into the future and cover all possible disputes with a vast array of counterparties." *See* Case Note, 134 Harv. L. Rev. 2871, 2875 (2021).

By its terms, the arbitration provision is almost unimaginably broad. First, as to *what*: It covers *any* claim "arising out of or relating to *any* aspect of the relationship between us." JA50 (emphasis added). It is just as broad as to with *whom* it requires customers to arbitrate: *any* person or entity within AT&T's corporate umbrella, regardless of when that entity joined the fold—or whether a customer could have any reasonable expectation that it might do so. *See id.* And finally, as to *when*: It requires customers to arbitrate claims that arise at *any* time, whether decades—or more—after a customer's contract with AT&T Mobility has been terminated, or long *before* they ever signed the contract. *See id.* The scope of these combined obligations is unknowable, exposing anyone who has ever signed an AT&T Mobility

customer agreement to the roving, unexpected risk that all sorts of disputes with any corporate entity could be sent to arbitration at any time. No consumer opening a new phone line could reasonably expect these far-ranging effects.

Courts have long cautioned against enforcement of contracts that impose obligations in unforeseeable situations. *See, e.g.*, *Jiffy Lube*, 847 F. Supp. 2d at 1263 (noting that a contract that forced into arbitration a dispute between a consumer and a franchisee of the contracting corporation "regarding a tort action arising from a completely separate incident . . . would clearly be unconscionable"); *Valued Servs. of Ky., LLC v. Watkins*, 309 S.W.3d 256, 262, 265 (Ky. Ct. App. 2009) (finding unconscionable an arbitration contract that "encompasse[d] an intentional tort"—false imprisonment—"with so little connection to the underlying agreement that it could not have been foreseen" by the plaintiff); *see also, e.g.*, *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1294 (2008); *Thompson v. Toll Dublin, LLC*, 165 Cal. App. 4th 1360, 1373 (2008). And courts have likewise held that contractual obligations "unlimited both in time and space" are unenforceable. *Reading Aviation Serv., Inc. v. Bertolet*, 311 A.2d 628, 630 (Pa. 1973); *see also Wexler*, 211 F. Supp. 3d at 503 (observing the "absurdity" of an "obligation to arbitrate" that "would last forever"); *Smith v. Steinkamp*, 318 F.3d 775, 778 (7th Cir. 2003) (an agreement requiring disadvantaged borrowers "to arbitrate disputes arising out of *future* agreements . . . might be thought unconscionable").

This arbitration contract, of course, implicates all the above concerns: It is sweeping with respect to duration, counterparty, type of claim, and nature of dispute all at once. Indeed, its *only* limit is "the requirement that the dispute involve" either AT&T Mobility or some "associated entity or person"—"which is, of course, no limit at all." *McFarlane*, 2021 WL 860584, at *6. That cannot be justified, at least not by reference to any commercially reasonable purpose. *See Brown I*, 724 S.E.2d at 288. AT&T Mobility has no interest—and DIRECTV identifies none in its brief—in the forum in which a onetime wireless customer litigates an entirely unrelated dispute with an employee, affiliate, or other tenuously connected entity.

Indeed, this case demonstrates how the contract requires arbitration in a vast array of completely unexpected circumstances. No ordinary person confronting AT&T Mobility's contract in 2012 would expect that an arbitration provision contained therein would require her to arbitrate, years later, a dispute with a totally separate, later acquired company. To be sure, "*arbitration* may be within the reasonable expectations of consumers." *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 90 (2003) (emphasis added). But consumers, like anyone else, expect arbitration to be "a matter of consent." *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010). When arbitration contracts contain unusual, unclear, or imbalanced provisions—like this one—they therefore do not fall within consumers' "reasonable expectations." *Brown II*, 729 S.E.2d at 228.

Consider just a few more examples of the sorts of obligations AT&T Mobility's arbitration contract imposes. Just by purchasing a short-term cell phone contract, a consumer might be forced to arbitrate:

- Claims against a company that was a fierce competitor of AT&T's throughout the parties' relationship;

- Claims against a company engaged in a totally distinct business—construction, cosmetics, oil and gas—that AT&T decided to buy a decade after the consumer entered into the contract;

- Claims against companies that don't exist yet, or AT&T employees who aren't born yet;

- Claims against a company that had told its customers it would *not impose* arbitration on them before it became affiliated with AT&T;

- Tort claims against an AT&T company or employee arising before the formation of the contract;

- Disputes arising out of a preexisting relationship—like an intellectual property dispute with a former employer that, "by virtue of an entirely fortuitous event," some company in the AT&T corporate family happened to acquire, *see Revitch*, 977 F.3d at 717-18; or

- Securities-fraud litigation against an AT&T affiliate based on corporate malfeasance, *see McFarlane*, 2021 WL 860584, at *8.

Nor does it end there. For instance, an unscrupulous company could exploit such clauses to its advantage—inducing customers to sign up for arbitration without realizing it would extend to shocking conduct they wouldn't want arbitrated. As Judge Posner wondered in a similar case involving a contract drafted by a payday lender, what if the lender murdered one of its borrowers "to discourage defaults and

her survivors brought a wrongful death suit" against the lender—and then sought to arbitrate the wrongful death claim? *Smith*, 318 F.3d at 777. Or what if an employee of the lender picked the borrower's pocket when she came in to pay back her loan, and the employee insisted on arbitrating a claim for conversion? *See id*.[3]

These examples illustrate the unreasonably broad scope of the "literal terms" of AT&T Mobility's arbitration contract, *McFarlane*, 2021 WL 860584, at *8—one that not only has "an overly harsh effect" on ordinary consumers, but far exceeds their "reasonable expectations," *Brown II*, 729 S.E.2d at 228-29. The district court was right to conclude that the striking overbreadth of the arbitration contract renders it substantively unconscionable.

**2. Unfairly one-sided.** The arbitration contract here is not only unreasonably harsh—it is also "one-sided." *See Brown I*, 724 S.E.2d at 287; *State ex rel. Richmond Am. Homes of W. Va., Inc. v. Sanders*, 717 S.E.2d 909, 920-22 (W. Va. 2011). As we explain below, the contract gives AT&T—the far more powerful party in the

---

[3] Contrary to DIRECTV's repeated assertions (at 38-39), the majority in *Mey I* did not categorically hold that "hypothetical scenarios are irrelevant" to any and all issues relating to AT&T Mobility's contract. Instead, as we explain below in Section II.B, the Court held that hypotheticals were not useful in determining the question presented—whether Ms. Mey's claims fell within the plain text of the arbitration provision's scope. *See Mey I*, 971 F.3d at 294-95. This Court made no pronouncement as to how the hypothetical reach of the provision might bear on the unconscionability analysis required by West Virginia law—and, in particular, whether the provision extends "beyond the reasonable expectations of an ordinary person." *Brown II*, 729 S.E.2d at 228.

bargain—the right to exploit a permanent obligation that it alone can understand and control. For this reason, too, the district court properly held it substantively unconscionable. *See* JA238-39.

The contract is one-sided in two ways. *First*, AT&T has countless agents, employees, affiliates, and other related entities, and will have many more over time, each of which could be entitled to compel a consumer to arbitrate a staggering array of different types of claims at any given moment. *See* JA20 (spelling out just part of AT&T's corporate structure). It would be unmanageable for another corporation, let alone an ordinary individual, to keep track of the sheer number of disputes that might be sent to arbitration under this arrangement. By contrast, while the arbitration provision applies to a consumer's agents and affiliates too, there are likely to be far fewer (if any) in the ordinary case. Thus, every time a consumer signs an AT&T Mobility contract, the company is in for roughly the same thing: the obligation to arbitrate claims against the consumer and perhaps in rare cases a successor or assign. But from a consumer's perspective, the obligation is boundless— it could apply to huge numbers of companies, individuals, and entities from the get-go, and untold others over time. *See* JA239.

*Second*, the informational disparity between the company and consumers also contributes to the contract's substantive unconscionability. AT&T has access to far better information about who constitutes one of its agents or affiliates than an

ordinary consumer could. And the company's contract leaves it in a position to both appreciate and act on the contract's breadth. With in-house lawyers and the expertise of drafting and enforcing its contract, the AT&T companies have better ability than anyone else to know and *even control* their corporate structure and to tailor their conduct accordingly. AT&T alone, therefore, can "accurately predict the extent of future" arbitration obligations. *Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294, 1299 (Ohio Ct. App. 1993). By contrast, it would be extremely difficult, if not impossible, for an ordinary consumer like Ms. Mey to do the same. All this means that companies in the AT&T family even have the option to *selectively enforce* the arbitration provision—choosing when they'd rather be in court while facing little risk that a consumer would realize they had the right to compel arbitration if they wanted to.

To be sure, an obligation's one-sidedness does not necessarily render the contract substantively unconscionable—although courts often treat it as the "paramount consideration." *Brown I*, 724 S.E.2d at 287. But "the facts and circumstances of [this] particular case" weigh in favor of such a finding because there is no public policy or business reason for corporations to impose boundless and unpredictable arbitration obligations on consumers with respect to disputes that have nothing to do with the parties' contract. *See id.* And this would be the case even if

DIRECTV were right that one-sidedness must be "extreme"—a standard that it seems to invent from thin air. Opening Br. 52 n.8.

**3.** DIRECTV essentially ignores all the above. Far from disputing the extraordinary breadth of the arbitration contract, DIRECTV embraces it. *See* Opening Br. 39. And the company makes no real effort to explain how the contract is commercially reasonable, or to address the concerns about AT&T Mobility's disproportionate ability to understand—and even to control—arbitration obligations. Instead, the company contends that the contract is not substantively unconscionable because various courts have generally upheld AT&T Mobility's arbitration contract, and the agreement has certain "pro-consumer" features. *See id.* at 48-53. But these arguments are not only meritless—they are beside the point.

Initially, DIRECTV is just wrong in claiming that the U.S. Supreme Court and the West Virginia high court "upheld" AT&T Mobility's arbitration provision. Opening Br. 49 (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011), and *Shorts v. AT&T Mobility*, 2013 WL 2995944, at *6 (W. Va. June 17, 2013)). Neither *Concepcion* nor *Shorts* said anything about the problem here—the contract's unreasonable breadth and one-sidedness. Both cases addressed entirely different questions. (*Shorts*, in fact, just applied *Concepcion*'s holding to compel arbitration in a case that had been filed before *Concepcion* was issued.) Any stray observations in these

decisions about the fairness of AT&T Mobility's contract thus have no bearing on the resolution of the unconscionability issue presented in this appeal.

Nor does it matter that the contract has some supposedly "pro-consumer terms." Opening Br. 50. Ms. Mey does not contend that the contract is substantively unconscionable because it, for instance, allows the company to select the arbitrator, or because it imposes asymmetrically higher costs on the consumer. Her argument is that the contract imposes starkly *different* obligations on consumers than on AT&T (and its many associated entities). The company faces *less* exposure to arbitration for unrelated claims, and it has more *ex ante* knowledge about that exposure—while consumers like Ms. Mey have no meaningful way to imagine or predict the breadth of affiliates or claims to which the contract will be applied. *See* pp. 22-25, *supra*. A company cannot immunize itself from an unconscionability challenge simply by pointing to a few—or even many—pro-consumer features in an otherwise unreasonably broad or oppressive contract. This Court should reject DIRECTV's attempt to do so.

### B. The arbitration contract is procedurally unconscionable because it was imposed on unsophisticated consumers as part of a take-it-or-leave-it contract inconveniently displayed on a pinpad device at the point of sale.

Because the arbitration contract is extremely substantively unconscionable, it would be unenforceable under West Virginia law even if it the district court found only a small degree of procedural unconscionability. *See Brown II*, 729 S.E.2d at 227.

Here, though, the court correctly concluded that the contract is thoroughly infected with procedural unconscionability as well.

"Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract." *Nationstar Mortg., LLC v. West*, 785 S.E.2d 634, 638 (W. Va. 2016). It often begins with a "contract of adhesion"—that is, a contract "drafted and imposed by a party of superior strength that leaves the subscribing party little or no opportunity to alter the substantive terms, and only the opportunity to adhere to the contract or reject it." *Brown II*, 729 S.E.2d at 228. These contracts receive "greater scrutiny" than those with bargained-for terms to determine if they "impose[] terms that are oppressive, unconscionable or beyond the reasonable expectations of an ordinary person." *Id.* As part of this scrutiny, West Virginia courts look to such factors as the degree of the parties' sophistication, "the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract," and the existence of "hidden or unduly complex contract terms." *Brown I*, 724 S.E.2d at 287. Here, all of these factors confirm that the arbitration provision is procedurally unconscionable.

**1.** To start, AT&T Mobility's contract is indisputably a contract of adhesion that warrants close scrutiny. JA233-34. The arbitration provision was a "non-

negotiable term" that Ms. Mey was not permitted to opt out of or alter if she wanted to obtain AT&T Mobility service. *See Richmond Am. Homes*, 717 S.E.2d at 920-22.

DIRECTV's insistence (at 45-46) that "there is nothing inherently wrong with a contract of adhesion" again misses the point. The district court did not conclude that the contract is procedurally unconscionable solely because it's a contract of adhesion. Just the opposite: It expressly recognized that "finding that there is an adhesion contract is *the beginning* point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad adhesion contracts which should not." JA232 (quoting *State ex rel. Ocwen Loan Servicing, LLC v. Webster*, 752 S.E.2d 372, 389 (W. Va. 2013)) (emphasis added).

**2.** The arbitration contract here fails that test. First, there is a vast gulf between the parties' sophistication. *See* JA233-34. AT&T Mobility is an enormous wireless service carrier that's part of a multinational telecommunications conglomerate. Between access to "full-time legal counsel" and the benefit of "routinely" entering contracts just like this one, it has the ability to draft and carefully hone whatever contract provisions it wants. *See Sanders*, 717 S.E.2d at 922. AT&T Mobility's customers couldn't be more different: As ordinary people, they have a much lower "level of sophistication or understanding" than the company or its attorneys. *Id.* That is even more true for Ms. Mey, because she wasn't even one of the company's wireless customers—she was just an authorized user on her husband's account. JA19. That

meant she was particularly unlikely to be familiar with the details of the company's wireless contracts or the contours of its corporate structure. AT&T Mobility's outsized bargaining position, in other words, made any "real and voluntary meeting of the minds" impossible. *See Sanders*, 717 S.E.2d at 922.

Next, the manner and circumstances under which this contract was formed underscore the gulf between the parties' bargaining power. *See id.* at 918-19 (examining the contract's fairness in light of "all of the facts and circumstances of a particular case"). The arbitration provision was presented to Ms. Mey as part of a boilerplate, take-it-or-leave-it contract inconveniently displayed in fine print on an electronic pinpad device at the time of her purchase. So DIRECTV's insistence (at 43) that Ms. Mey "had the opportunity to read the entire Wireless Customer Agreement, either on the signature-capture-device screen or printed out on paper" both misstates the record and defies common sense.

Consider what the AT&T Mobility transaction looked like from Ms. Mey's perspective. *See* JA234. The company presented an ordinary wireless consumer—one who was not even an accountholder herself—with a small electronic pinpad device that displayed a few lines at a time of the company's "Wireless Customer Agreement." *See* JA145, 148-50. To understand those terms, a customer would need to click through each of those tiny screens, one by one, read and take the time to understand each, and then find the arbitration provision. JA145, 148. And AT&T

29

Mobility did nothing to draw consumers' attention to either those terms or to their unexpected breadth. The company made it easy to simply click through to skip straight to an "Acceptance" screen. JA145, 148. While that screen referenced arbitration, it gave no hint that the arbitration provision could apply to claims arising before or after the contract was signed, against not just AT&T Mobility but any other entity with which it might one day form a relationship. *See Nationstar*, 785 S.E.2d at 639 (noting that a contract of adhesion would be procedurally unconscionable, even if the consumer did not understand or read it, if the contract "imposes terms beyond the reasonable expectations of an ordinary person").

Despite all this, DIRECTV asserts (at 43) that "there was nothing hidden or unduly complex about AT&T Mobility's arbitration provision or how it was presented to Mey." But, as explained, that's not true. DIRECTV unreasonably expects that Ms. Mey should have paged through dozens of tiny pages on a pinpad device and found the arbitration provision—all while standing in front of a sales representative at the point of sale—or made an unwelcome request to have them printed. And even if Ms. Mey theoretically could have found the arbitration terms, DIRECTV fails to recognize that comprehending their meaning asks much of an ordinary consumer—particularly on an electronic pinpad that renders ordinary text as fine print. Indeed, it is just this "fine print"—or similar "legalese disclaimers"—

that may constitute the sorts of "sharp or deceptive practices" that serve as a basis for a finding of procedural unconscionability. *See Brown I*, 724 S.E.2d at 286-87.

Moreover, even assuming Ms. Mey *had* tracked down the arbitration provision one way or another, it is unlikely she had a "reasonable opportunity to understand" its breathtaking scope. *Id.* at 287. Indeed, the provision's scope has proven so "unduly complex" that even federal courts of appeals cannot agree as to its meaning. *Compare, e.g.*, *Revitch*, 977 F.3d at 717-18, *with Mey I*, 971 F.3d at 292-95.

* * * * *

Bottom line: The arbitration contract here is essentially limitless. It binds Ms. Mey in all disputes, against any past, current, or future AT&T entity, for all time. And it was presented to Ms. Mey as part of a lengthy, take-it-or-leave-it contract on a tiny electronic pinpad at the point of sale. This Court should affirm the district court's conclusion that such an unreasonably broad provision is unconscionable under West Virginia law. *See Goodwin v. Branch Banking & Tr. Co.*, 699 F. App'x 274, 276 (4th Cir. 2017) (affirming district court's ruling that arbitration agreement was "unconscionable under West Virginia law").

## II.   DIRECTV's attempts to evade a decision on the merits of Ms. Mey's unconscionability challenge should be dismissed.

In its brief, DIRECTV spends far more time urging this Court to avoid addressing the merits of the district court's ruling than it does explaining why the arbitration contract is not unconscionable. Specifically, DIRECTV argues that any

unconscionability challenge is waived and that this Court's previous decision in *Mey I* controls the outcome of this appeal. Neither argument is persuasive.

## A. The district court did not abuse its discretion in rejecting DIRECTV's waiver argument.

DIRECTV's core argument is that Ms. Mey has "waived any unconscionability challenge." Opening Br. 24-34. That is wrong. The district court acted well within its discretion in considering whether AT&T Mobility's contract was unconscionable after this Court specifically remanded that issue to the district court to be addressed in the first instance.

**1.** The purpose of the forfeiture doctrine is to ensure that a party does not spring unexpected arguments on the other parties, well into discovery or on the eve of trial—or at some other disruptive point in the proceeding—to try to claim some litigation advantage. *See, e.g.*, *Rogers v. McDorman*, 521 F.3d 381, 386 (5th Cir. 2008) (a party shouldn't be "permitted to lie behind a log" and "ambush" its opponent "with an unexpected defense"). But it doesn't prevent parties from raising relevant arguments solely on the ground that they are new or bar courts from considering relevant arguments that were not previously addressed. Instead, it has long been the rule that district courts may entertain arguments the parties could have raised earlier, so long as doing so would cause no unfair surprise or prejudice. *See Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997); *Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1164 (4th

Cir. 1985). The district court did not abuse its discretion in concluding that neither is present here.

**No surprise.** First, there was nothing surprising about the district court's decision to take up the unconscionability issue. After all, the district court took care to flag the issue in its first order, *see* JA181; DIRECTV itself briefed the question, *see* D. Ct. Dkt. 15 at 11-12; *Mey I* Opening Br. at 31-35; and this Court instructed the district court to consider it in the first instance on remand. Presumably for these reasons, DIRECTV never bothered to argue that considering the issue would somehow cause it surprise—so the district court did not abuse its discretion in finding none.

**No prejudice.** Nor has DIRECTV shown that the district court abused its discretion in rejecting the company's weak assertion of prejudice. It scarcely even tried. All DIRECTV told the district court was that it would somehow suffer "obvious prejudice" if the court "permitted" the issue to be addressed after the case had been pending for two years. D. Ct. Dkt. 191 at 6. But it was *this Court* that expressly instructed the district court to consider unconscionability on remand. It was hardly an abuse of discretion for the district court to follow that command. And the company's unexplained say-so gave it no reason to conclude otherwise.[4]

---

[4] Elsewhere, DIRECTV lodged the related point that it would "necessarily" suffer prejudice by being "forced" to "undergo the very type of litigation expenses that arbitration was designed to alleviate." Dkt. 191 at 7-8; *see also* Opening Br. 30 (similar). But what expenses? The actual litigation of Ms. Mey's claims has been stayed, and all DIRECTV has had to do in the meantime is brief issues that it either

And make no mistake: This Court's decision to remand the unconscionability issue made sense. The district court hadn't had the occasion to address the issue in full yet because its first order rested on the issues of formation and scope—issues it reasonably viewed as logically antecedent to the question of unconscionability. *See Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 179-80 (4th Cir. 2013) (deciding the issues of formation and scope before reaching unconscionability); *see also, e.g., Anand v. Health*, 2019 WL 2716213, *2 n.1 (N.D. Ill. June 28, 2019) ("The question of contract formation is antecedent to the enforcement of specific terms of the contract. . . .").[5]

There was thus no reason for this Court to consider the issue in the first instance either. Instead, given that the district court raised, but did not decide, the issue in its initial order, this Court—as a "court of review, not of first view"—made

---

chose to or that it had been directed to brief by courts. *See Smith*, 117 F.3d at 969 (no prejudice when party was given sufficient time to brief a new issue). It offered the district court no support to show that it spent resources on discovery or made strategic decisions that somehow turn on excluding the unconscionability issue from consideration. In fact, DIRECTV itself has voluntarily decided to brief unconscionability multiple times.

[5] This is, in fact, exactly the order of operations that DIRECTV has *itself* recommended. *See Mey I* Oral Arg. at 37:48-58 (explaining that these sorts of cases involve "two questions": "first," whether the plaintiff's claim "is covered," and "second," whether there "is a state law defense to applying" the contract—such as unconscionability); *id.* at 37:58-38:14 (Question: "So . . . we should construe the agreement to reach well beyond what is conscionable and then just use unconscionability doctrine to write in the limits that ought to be in this agreement?" Answer: "Correct.").

the correct decision to remand the question to the district court to be addressed in full. *Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006).

**2.** DIRECTV barely disputes the lack of prejudice and surprise here. Instead, the company insists that this case is somehow different for purposes of waiver because there was an intervening appeal, and because it involves a motion to compel arbitration. It is mistaken on both counts.

**a.** DIRECTV's first argument is premised on a basic misunderstanding of the law. It insists (at 24) that, as soon as there has been an appeal, the law of forfeiture changes, and a district court no longer has the discretion to address any arguments or issues unless the parties raised them before the appeal was taken.

That argument makes no sense. Here, it was *this Court* that explicitly commanded the district court to "analyze unconscionability under West Virginia law" in the first instance "on remand." *Mey I*, 971 F.3d at 295. And this Court specifically left it for the district court to decide if "Mey waived any unconscionability challenge to the arbitration agreement by failing to raise it in the district court." *Id.* This Court expressly recognized, in other words, that nothing about the waiver question turned on the first appeal or the remand—it was up to the district court to determine whether the normal factors (prejudice and surprise) required waiver here. And, as explained above, the district court appropriately found that they did not.

In any event, DIRECTV fails to recognize that district courts have long enjoyed discretion to consider on remand arguments even if they could have been raised sooner so long as doing so is consistent with the mandate.[6] As with the question of forfeiture when there has been no intervening appeal, the question remains the same: whether the issue was raised at a "pragmatically sufficient time," including whether the other party was in any way prejudiced. *Pasco*, 566 F.3d at 577.

DIRECTV's cases (cited at 24-25) don't say otherwise. By and large, they hail from a different context: When parties have lost on some issue in the district court, made the choice to appeal on only one theory, won some limited remand, and then sought to pursue a new theory when the old one didn't work out. *See, e.g.*, *Labor Rels. Div. of Constr. Indus. of Mass., Inc. v. Teamsters Local 379*, 156 F.3d 13, 15-17 (1st Cir. 1998); *Omni Outdoor Advert., Inc. v. Columbia Outdoor Advert., Inc.*, 974 F.2d 502, 504 (4th Cir. 1992); *Fiberlink Commc'ns Corp. v. Magarity*, 72 F. App'x 22, 23-24 (4th Cir. 2003). Unsurprisingly, in those circumstances, "the accident of remand" typically does not give a party an opportunity to try out some new theory it failed to raise earlier. *United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001).

---

[6] *See, e.g.*, *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009) (party could raise new defense on remand); *United States v. Sanchez-Lopez*, 879 F.2d 541, 556 (9th Cir. 1989) (similar); *Meyers v. Baltimore County*, 981 F. Supp. 2d 422, 433 (D. Md. 2013) (similar); *Riley v. MEBA Pension Tr.*, 452 F. Supp. 117, 120 (S.D.N.Y. 1978) ("The district court, . . . in its discretion, may permit a party to raise an issue on remand which could have been, but was not, raised in earlier proceedings."), *aff'd*, 586 F.2d 968 (2d Cir. 1978).

That is not the case here. As the district court properly noted, the principle that *appellants* can't test out new theories one by one has no place as applied to a party like Ms. Mey. That's because she was an *appellee* in the first appeal—and "[f]orcing an appellee" to surface "every conceivable" argument in their first appeal has none of the efficiency benefits of imposing the same rule on an appellant. *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 740 (D.C. Cir. 1995) (explaining that it is the *appellant*, not the appellee, who "define[s] the battleground" of an appeal). Because of this basic distinction, courts of appeals have long employed considerable "leniency in applying the waiver rule to issues that could have been raised by appellees on previous appeals." *Id.*; *see also Kessler v. Nat'l Enters., Inc.*, 203 F.3d 1058, 1059 (8th Cir. 2000); 18B Wright & Miller, Fed. Prac. & Proc. § 4478.6 (2021).[7]

DIRECTV insists that these basic points are "inapposite" because they concern what happens when a party fails to raise an issue in its first *appeal*—not what happens when a party fails to raise an argument before that appeal. But that is just wrong: Courts entertain issues raised for the first time on remand all the time. *See Yesudian ex rel. United States v. Howard University*, 270 F.3d 969, 971 (D.C. Cir. 2001) (rejecting contention that party forfeited argument by failing to present it *either* in the

---

[7] DIRECTV insists (at 32-33) that *Kessler* is somehow "inapposite" because the court there ultimately concluded that the appellee *had* forfeited the contested issue. But the point isn't that appellees can *never* forfeit an issue—it's that they do not *automatically* do so simply by failing to raise it in some earlier proceeding.

first appeal *or* to the district court before that appeal, and noting that any such forfeiture "is far from absolute, especially where, as here, the party failing to present the issue was the appellee, defending on a field of battle defined by the appellant"); *see also, e.g.*, *Pasco*, 566 F.3d at 577; *Sanchez-Lopez*, 879 F.2d at 556; *Meyers*, 981 F. Supp. 2d at 433. And because DIRECTV suffered neither prejudice nor surprise by the district court's consideration of unconscionability here, the district court acted well within its discretion in doing so.

**b.** DIRECTV is similarly mistaken in its suggestion that something about the arbitration context changes the application of the basic rules of forfeiture.

It first insists that the Eleventh Circuit's decision in *In re Checking Account Overdraft Litigation*, 754 F.3d 1290 (11th Cir. 2014), somehow says otherwise. It does not. There, the Eleventh Circuit rejected a bank's eleventh-hour attempt to compel a dispute into arbitration under the distinct doctrine of *arbitration waiver*, because the bank had done two things: "substantially participate[d] in litigation to a point inconsistent with an intent to arbitrate," and in doing so caused "prejudice to the opposing party." *Id.* at 1294. But such a holding has no relevance here: the bank's "substantial participation" was *filing* an appeal, not defending against one; the bank had engaged in conduct inconsistent with the relief it now sought; and the bank had prejudiced its customer in the process. None of that has happened here.

38

Nor is it relevant that DIRECTV has had to wait longer than it would like to commence its arbitration. The reason the parties remain in federal court, litigating the threshold issues of scope and unconscionability in the precise order DIRECTV says they should be, is the very contract DIRECTV seeks to enforce—which provides in no uncertain terms that these questions are "for the court to decide." JA51.

### B. Because *Mey I* involved only formation and scope, it does not control the resolution of unconscionability here.

Shifting gears, DIRECTV repeatedly claims (at 35-41) that, even if the district court was right to reach the issue, this Court in *Mey I* already "answered" the unconscionability question—and that *Mey I* is thus somehow "law of the case" on the issue. That is wrong. This Court specifically left it open for the district court to determine, in the first instance, whether the arbitration contract is unconscionable under West Virginia law. And that is precisely what the district court did. Nor did this Court give any indication in *Mey I* as to how it would decide unconscionability. DIRECTV's attempt to avoid a ruling on the merits should be rejected.

**1.** In *Mey I*, this Court expressly declined to weigh in on the unconscionability issue, instead instructing the district court to "analyze unconscionability under West Virginia law . . . on remand." *Mey I*, 971 F.3d at 295. This is enough, on its own, to reject the DIRECTV's meritless "law of the case" argument. The fact that this Court specifically instructed the district court to address unconscionability for the first time

on remand makes clear that this Court did not believe that its holding controlled the unconscionability question.

That makes sense. In *Mey I*, this Court addressed entirely distinct issues—the arbitration contract's formation and scope. It never once purported to pass on the question whether the contract is unconscionable under West Virginia law. Nor did it say anything about its unfairness. It is black-letter law that a decision cannot serve as law of the case as to issues it never decided. *See, e.g., Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) ("Although the [law-of-the-case] doctrine applies both to questions actually decided as well as to those decided by necessary implication, it does not reach questions which might have been decided but were not."); *Dickinson v. Auto Ctr. Mfg. Co.*, 733 F.2d 1092, 1101 (5th Cir. 1983) ("[T]he 'law of the case' principle does not bar our considering the issue because it was never decided, either expressly or by necessary implication, in the prior appeals.").

**2.** Perhaps recognizing all this, DIRECTV eventually acknowledges (at 34-35) that this Court left it to the district court to decide unconscionability. But in a further effort to evade the merits, the company argues (at 37-38) that the district court supposedly "embraced reasoning that this Court rejected in *Mey I*." Not so. Although DIRECTV cherry-picks passages from *Mey I*, the company never actually describes the reasoning in that decision—which, as noted, concerned *only* the agreement's formation and scope. *See Mey I*, 971 F.3d at 286 (describing issues presented).

Specifically, in *Mey I*, this Court sought to determine—based on the plain text of the AT&T Mobility arbitration contract—whether DIRECTV was an "AT&T Mobility affiliate" within the meaning of the contract, and whether Ms. Mey's claims against DIRECTV fell within that contract's scope. In concluding that it did, the Court relied primarily on the provision's extraordinarily broad language. *See id.* at 293. And it confirmed that conclusion by reference to other provisions in the AT&T Mobility wireless customer agreement. *See id.* at 294. All of this, the Court held, made the contract "susceptible of an interpretation that covers Mey's TCPA claims." *Id.* This Court concluded, in other words, that "[t]he text of the agreement *arguably* contemplates arbitration of Mey's claims"—and it then resolved this ambiguity in favor of arbitration under the federal presumption in favor of arbitrability. *See id.* (emphasis added).[8]

Contrary to DIRECTV's claims, the district court's analysis did not cast doubt on any of this reasoning. It just picked up right where this Court left off. That is, it *accepted* this Court's analysis of the plain text of the provision in *Mey I* as broadly covering all disputes between Ms. Mey and any AT&T affiliate. And it was based on that very analysis, and the remarkable breadth it uncovered, that the district court concluded the provision was so commercially unreasonable as to be unconscionable.

---

[8] That presumption plays no role here—both because this appeal concerns a generally applicable contract defense (not contract interpretation), and because section 2 of the FAA does not apply at all. *See* Section III.A, *infra*.

The district court, in other words, did exactly what this Court instructed it to do. Indeed, that is exactly what DIRECTV said it should do, too. *See Mey I* Oral Arg. at 37:48-58 (arguing that this case involves "two questions," to be taken in order: "first," whether the plaintiff's claim "is covered," and "second," whether there "is a state law defense to applying" the contract).

What's more, if DIRECTV were right that—despite this Court's clear statement to the contrary—the Court's decision on formation and scope was somehow also decisive on unconscionability, there would have been no need for this Court to remand on that question. The Court would have just decided unconscionability itself in *Mey I.*

But it did not do that—it remanded because it correctly recognized that formation and scope warrant a different inquiry than unconscionability. The former, this Court previously explained, requires that a court "interpret and enforce the words of the particular arbitration provision to which the parties agreed." *Mey I*, at 293. But, under West Virginia law, unconscionability turns on whether a contract "imposes terms that are oppressive, unconscionable or beyond the reasonable expectations of an ordinary person." *Brown II*, 729 S.E.2d at 228. In *Mey I*, this Court said nothing about the latter question.

**3.** Instead of engaging with these doctrinal differences, DIRECTV quibbles with aspects of the decision below. *See* Opening Br. 34-41. Each of its objections is easily dismissed.

DIRECTV contends, for instance, that the district court's ruling conflicts with *Mey I* because it relied on hypotheticals. Opening Br. 37-39. But that misstates both decisions. *First,* although the district court quoted from decisions that referenced hypotheticals, nothing about its unconscionability analysis turned on them. Instead, it correctly ruled, as required by West Virginia law, that it was unconscionable to apply the arbitration agreement based on the circumstances and facts of *this* particular dispute. JA230-39; *see* Section I, *supra*. *Second*, and more importantly, *Mey I* did not categorically reject examining the hypothetical reach of the arbitration provision, as DIRECTV claims (at 37-38). All this Court said was that hypotheticals were not helpful for determining whether "Mey's TCPA claims about DIRECTV's advertising calls f[e]ll within [the provision's] scope"—citing an Eighth Circuit decision that was similarly confined to a scope question. *Mey I*, at 295 (citing *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 878 (8th Cir. 2018). Whether such hypotheticals might be useful in evaluating the provision's unconscionability—and, in particular, assessing a consumer's reasonable expectations—is a question that *Mey I* simply did not address.

Nevertheless, DIRECTV repeatedly suggests that this Court weighed in on a person's reasonable expectations about the agreement in *Mey I. See, e.g.*, Opening Br. 2-3, 21, 39, 41. But it didn't—all it did was hold that this dispute was covered by "the expansive text of the arbitration agreement." *Mey I*, at 294. Not once did this Court mention reasonable expectations or fairness. That makes sense: The answer to the scope question presented in *Mey I* turned on the "text of the agreement" alone. 971 F.3d at 294. In other words, nothing in *Mey I* barred the district court from considering the hypothetical reach of the agreement to determine whether, under West Virginia law, it exceeded an ordinary consumer's "reasonable expectations" or "commercial reasonableness." Accordingly, the district court reasonably looked to other examples of disputes that would be covered by the broad arbitration provision here to ascertain the provision's unconscionability.

The district court's reliance on other case law interpreting similarly expansive arbitration provisions is no more problematic, despite DIRECTV's complaints. *See* Opening Br. 35-38, 40 (discussing cases). To be sure, those cases concerned scope and formation issues, and they reached different conclusions on those issues than this Court in *Mey I* did. But the district court cited them for their discussion of issues relating to ordinary consumers' reasonable expectations and the provision's commercial reasonableness. JA237-47. These are precisely the issues that this Court in *Mey I* expressly declined to decide—and that the Court instructed the district court

44

to resolve in the first instance after remand. So there was nothing wrong about reviewing other cases that analyzed how the AT&T Mobility contract's remarkable breadth offends consumers' reasonable expectations.

Try as it might, DIRECTV cannot fault the district court for simply doing what this Court previously told it to do. The company's attempt to evade a ruling on the merits of unconscionability should be rejected.

## III.    The Federal Arbitration Act does not preempt the district court's application of West Virginia's unconscionability doctrine.

Taking a different tack, DIRECTV argues (at 53-57) that the district court's ruling is preempted by the FAA—regardless of the merits of its unconscionability analysis. But this argument should also be rejected.

*First*, the FAA does not apply at all here. That's because section 2 makes clear that the statute covers only those controversies that "arise out" of the contract in which a given arbitration provision appears. Because Ms. Mey's TCPA claims against DIRECTV have no connection to her contract with AT&T Mobility, this dispute falls outside of the FAA's scope. *Second*, even if the FAA does apply, section 2 explicitly authorizes courts to apply generally applicable state-law defenses, like unconscionability, so long as the application does not specifically disfavor arbitration. Here, DIRECTV identifies nothing about the district court's unconscionability analysis that targets arbitration.

### A.   The Federal Arbitration Act does not apply here because Ms. Mey's TCPA claims against DIRECTV do not "arise out" of her contract with AT&T Mobility.

As the Supreme Court has recognized, the federal courts' "authority under the [Federal Arbitration Act] to compel arbitration . . . isn't unconditional." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019). "Instead, antecedent statutory provisions limit the scope of the court's powers" to compel arbitration. *Id.*; *see Degidio v. Crazy Horse Saloon & Rest. Inc.*, 880 F.3d 135, 140 (4th Cir. 2018) ("[T]he policy undergirding the FAA is not without limits.").

One of these antecedent provisions is section 2, which provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out* of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2 (emphasis added). With this text, section 2 makes clear that the FAA applies *only* to controversies "arising out" of the contract containing the arbitration agreement that a party is trying to enforce. *See Calderon*, 2021 WL 2946428, at *6. So, "[b]y negative implication, the FAA does not require the enforcement of an arbitration clause to settle a controversy that does not arise out of the contract or transaction." *Revitch*, 977 F.3d at 721 (O'Scannlain, J., concurring).

This is such a case: The "controversy" here—DIRECTV's telemarketing violations—does not in any way "arise out" of Ms. Mey's contract with AT&T

Mobility—the only contract that contains an arbitration provision. The FAA, therefore, simply does not apply.

That conclusion is dictated by section 2's text. To be sure, as this Court explained in *Mey I*, the phrase "arising out of" has a "broad" scope. 971 F.3d at 292-93. Nevertheless, the reach of that phrase must have *some* limits. For instance, the Eleventh Circuit recently held that section 2's language requires that the controversy be "an immediate, foreseeable result of the performance" of the contract containing the arbitration provision. *Calderon*, 2021 WL 2946428, at \*6. And, though this Court has not interpreted this language in the section 2 context, it has "consistently held that an arbitration clause encompassing all disputes 'arising out of or relating to' a contract embraces every dispute between the parties *having a significant relationship* to the contract regardless of the label attached to a dispute." *Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 767 (4th Cir. 2006) (emphasis added).[9]

---

[9] This understanding is consistent with how courts interpret "arising out of" language in varied contexts. *See, e.g.*, *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (holding, in the insurance context, that "the phrase 'arising out of is ordinarily understood to mean originating from, incident to, or having connection with"); *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 99 (3d Cir. 2018) (holding "that 'arising out of' in a forum-selection clause should be interpreted in accordance with the ordinary meaning of that phrase—*i.e.*, to originate from a specified source"); *In re Woods*, 743 F.3d 689, 698 (10th Cir. 2014); (holding that debt "'arises out of' a farming operation [under the Bankruptcy Code] only if the debt is directly and substantially connected to the farming operation"); *St. Luke's Cataract & Laser Inst., P.A. v. Zurich Am. Ins. Co.*, 506 F. App'x 970, 977 (11th Cir. 2013) (The term "requires more than a mere coincidence between the conduct . . . and the injury. It requires some causal connection, or relationship."). And it is consistent with the FAA's

For the FAA to apply, then, the controversy must—at the very least—have some "relationship" or "connection" to that contract. *See Revitch*, 977 F.3d at 722 (O'Scannlain, J., concurring) ( "[A]t a minimum, [the FAA] must exclude claims that are completely unrelated to the underlying contract or transaction."). Here, there is plainly no such relationship between Ms. Mey's TCPA claims against DIRECTV and her contract with AT&T Mobility. "[T]he pertinent relationship" covered by the contract is that by "which AT&T Mobility (or its 'affiliates') provides [Ms. Mey] with wireless services." *See id.* at 724 (O'Scannlain, J., concurring). But DIRECTV's attempts to sell its satellite television products in violation of the TCPA do "not in any way involve the formation or performance of a contract for wireless services between [Mey] and AT&T Mobility." *Id.* Indeed, Ms. Mey's "complaint doesn't name [AT&T] as a defendant, identify any wrongdoing by [AT&T], or allege any violation of [AT&T's contract] by anyone." *See Calderon*, 2021 WL 2946428, at *7. This controversy is, in other words, wholly unrelated to the contract containing the arbitration provision—it does not "aris[e] out of" it. 9 U.S.C. § 2.

In short, because Ms. Mey's TCPA claims against DIRECTV have no relation or connection to her contract with AT&T Mobility, the FAA does not apply.

---

history: "Section 2's requirement of a contractual nexus was a deliberate choice" by Congress. Horton, 168 U. Pa. L. Rev. at 679; *see also id.* at 679-80 (describing the FAA's drafting history).

It therefore cannot preempt the district court's application of West Virginia's unconscionability doctrine.

### B. Nothing about the district court's state-law unconscionability analysis targets or disfavors arbitration.

Even if the FAA does apply, however, this Court should reject DIRECTV's preemption argument. Under section 2 of the FAA, courts "must enforce arbitration agreements on an equal footing with other contracts." *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017) (citing *Concepcion*, 563 U.S. at 339). Thus, as DIRECTV acknowledges (at 53), "the generally applicable contract defense of unconscionability" may render an arbitration agreement unenforceable so long as it does not "target[] the existence of an agreement to arbitrate as the basis for invalidating that agreement." *Muriithi*, 712 F.3d at 180. Indeed, "[t]he Supreme Court has . . . repeatedly identified unconscionability as one of the general principles of contract law that, if applied impartially, may be applied to arbitration agreements under § 2." *In re Checking Acct. Overdraft Litig. MDL No. 2036*, 685 F.3d 1269, 1278 (11th Cir. 2012); *see Doctor's Assocs.*, 517 U.S. at 687.

That is what the district court did here: It applied general principles of West Virginia contract law to conclude that this arbitration contract was unconscionable. And that conclusion did not turn on the fact that the agreement was *to arbitrate*. Instead, the district court pointed to a number of factors—the extraordinary breadth of the provision, the one-sided nature of the obligations, the hidden and complex

nature of the terms, and the circumstances of the contract's formation—all of which, combined, made the provision unconscionable. *See* Section I, *supra*. In other words, the problem with AT&T Mobility's arbitration contract, and DIRECTV's attempt to exploit it, is not that it sends claims to arbitration—it's that it makes it impossible for ordinary consumers to know when or whether that will happen.

Nevertheless, DIRECTV repeatedly asserts (at 54-56) that the district court's ruling was motivated by "hostility" to arbitration, and that, therefore, it must be preempted by the FAA. But, despite DIRECTV's repetition, that's all that is—an assertion. The company does not (and cannot) identify any way in which the district court's unconscionability analysis "rel[ied] on the uniqueness of an agreement to arbitrate." *Dillon*, 856 F.3d at 334. In fact, DIRECTV's lead argument on preemption demonstrates the weakness of its position. The big preemption problem, apparently, is that the district court quoted, in the background section of its order, "a law-review article that criticizes broadly worded arbitration provisions." Opening Br. 54-55. But that article played no part in the district court's actual application of West Virginia unconscionability law. *See* JA230-39. FAA preemption does not apply just because a court cites a secondary source that critiques some aspect of arbitration.

DIRECTV's other complaints likewise fall flat. For instance, according to the company, the district court "suggest[ed] that agreeing to arbitrate [her] claims was inherently harmful to Mey." Opening Br. 55-56 (citing JA234). But this blatantly

mischaracterizes the district court's actual concern: that Ms. Mey faced the prospect of being forced to "arbitrate *any* dispute arising out of *any* relationship with virtually *any* of AT&T Mobility's corporate cousins—a list that could, overtime, comprise AT&T Mobility's current competitors or not-yet created subsidiaries." JA234 (emphasis added). The district court's point was not that arbitration is "inherently harmful," but that the contract here is so broad that, if enforced, Ms. Mey would be locked in forever to arbitrate with an unknowably vast array of entities. The district court correctly held that, under generally applicable West Virginia law, such a broad contractual provision—that operates to constrain a contracting party against an infinite set of counterparties for an infinite period of time—is unconscionable. And this analysis "would apply equally to an 'infinite forum selection clause' or an 'infinite liability limitation clause.'" *McFarlane*, 2021 WL 860584, at *8.

DIRECTV's final argument in favor of preemption makes even less sense. It contends (at 56) that the district court's ruling must have been motivated by hostility to arbitration because the "court identified nothing unfair or one-sided about the arbitration agreement itself." But that's wrong: As we have explained, the contract *is* unfair and one-sided. *See* Section I.A, *supra*. In any event, DIRECTV can't claim that the district court's ruling was hostile to arbitration just because it disagrees with the court's ultimate conclusion on unconscionability. That would undermine section 2's core tenet—that the FAA does not preempt generally applicable contract defenses

that "treat an arbitration provision like any stand-alone contract." *Noohi v. Toll Bros.*, 708 F.3d 599, 612 (4th Cir. 2013).

At bottom, the district court here did not do "what *Concepcion* barred: adopt a legal rule hinging on the primary characteristic of an arbitration agreement." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1427 (2017). Its unconscionability analysis "appl[ies] generally, rather than single[s] out arbitration." *See id.* at 1428 n.2. The district court's unremarkable application of West Virginia law should therefore be affirmed.

## CONCLUSION

This Court should affirm the district court's denial of DIRECTV's motion to compel arbitration.

Respectfully submitted,

*/s/Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
LINNET DAVIS-STERMITZ
GUPTA WESSLER PLLC
2000 L St NW, Suite 850
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

JOHN W. BARRETT
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555

MATTHEW P. MCCUE
THE LAW OFFICE OF
MATTHEW P. MCCUE
1 South Avenue, Suite 3
Natick, MA 01760
(508) 655-1415

EDWARD A. BRODERICK
BRODERICK LAW, P.C.
176 Federal Street, Fifth Floor
Boston, MA 02111
(617) 738-7080

ANTHONY PARONICH
PARONICH LAW, P.C.
350 Lincoln St., Suite 2400
Hingham, MA 02043
(617) 485-0018

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because this brief contains 12,871 words, excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

July 29, 2021                                    */s/ Matthew W.H. Wessler*
                                                 Matthew W.H. Wessler

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2021, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants will be served by the CM/ECF system.

July 29, 2021

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler